*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
FULTON, CRISFIELD, and HITESMAN,
Appellate Military Judges

_____

**UNITED STATES**
Appellee

**v.**

**Alan D. DORRBECKER**
Captain (O-6), U.S. Navy
Appellant

**No. 201700347**

Decided: 29 May 2019.

Appeal from the United States Navy-Marine Corps Trial Judiciary. Military Judges: Captain Robert Monahan, JAGC, USN (arraignment); Captain Robert J. Crow, JAGC, USN (trial). Sentence adjudged 8 June 2017 by a general court-martial convened at Norfolk, Virginia, consisting of a military judge sitting alone. Sentence approved by convening authority: confinement for 8 years and a dismissal from the United States Naval Service.[1]

For Appellant: Mr. Michael B. Hanzel, Esq.; Lieutenant Clifton E. Morgan III, JAGC, USN; Lieutenant Doug Ottenwess, JAGC, USN.

For Appellee: Lieutenant Clayton S. McCarl, JAGC, USN; Captain Brian L. Farrell, USMC.

---

[1] Pursuant to a pretrial agreement, the convening authority disapproved the adjudged forfeitures, approved the remaining sentence, and, except for the dismissal, ordered it executed.

Judge CRISFIELD delivered the opinion of the Court, in which Senior Judge FULTON joined. Judge HITESMAN filed a separate dissenting opinion.

————————————

**PUBLISHED OPINION OF THE COURT**

————————————

CRISFIELD, Judge:

A military judge convicted the appellant, pursuant to his pleas, of two specifications of attempted sexual abuse of a child and, contrary to his pleas, of one specification of attempted sexual assault of a child, two specifications of attempted sexual abuse of a child, one specification of violating a lawful general order, and one specification of conduct unbecoming an officer and a gentleman in violation of Articles 80, 92, and 133, Uniform Code Military Justice (UCMJ).[2]

The appellant raises three assignments of error: (1) the evidence is factually and legally insufficient to prove that the appellant had the specific intent to commit sexual assault of a child and sexual abuse of a child, or that he took a substantial step to do so; (2) the government failed to prove beyond a reasonable doubt that the appellant was not entrapped;[3] and (3) the court-martial order (CMO) mislabels the offenses.

After careful consideration of the entire record of trial and the parties' submissions, we determine that the approved findings and sentence are correct in law and fact and that no error materially prejudicial to the appellant's substantial rights occurred. Arts. 59 and 66, UCMJ. Accordingly, the findings and sentence as approved by the convening authority are affirmed.

---

[2] 10 U.S.C. §§ 880, 892, 933.

[3] Appellant raises this assignment of error personally under *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). The appellant only raises the defense of entrapment in regard to the specifications to which he pleaded not guilty. Appellant's Brief at 43. With regard to the specifications to which the appellant pleaded guilty, during the providence inquiry he explained that he was not entrapped "because [he] was the one that initiated" the communications. Record at 153. We have reviewed this issue and find that it is without merit. *See United States v. Clifton*, 35 M.J. 79 (C.M.A. 1992).

## I. BACKGROUND

The appellant met S.M., a 14-year-old girl, at the base library aboard Naval Support Activity, Capodichino, Naples, Italy. S.M. worked at the library as a part-time summer employee. The appellant and S.M. struck up a conversation about books and the appellant gave S.M. his email address so that she could contact him about a website offering free books. S.M. contacted the appellant and they emailed each other over the next week. S.M.'s parents were both employees of the Naval Criminal Investigative Service (NCIS) stationed in Naples. When they discovered their daughter was communicating with an adult man, they discussed the situation with co-workers. One co-worker advised them that the appellant might be "grooming" S.M. for sex. Soon thereafter NCIS opened an investigation into the appellant's conduct by assuming S.M.'s on-line persona.[4] On the first day of the investigation, the real S.M. told the appellant not to come to the library because she was busy. Later that evening, an NCIS special agent, playing the role of S.M., reinitiated contact with the appellant by means of a new email address. The agent informed the appellant that her parents were monitoring her regular email account. She therefore created the new email account so she and the appellant could continue to communicate in private.

After NCIS assumed the persona of S.M., the subject matter of their conversations changed from books, music, school, and family life to overtly sexual topics. The appellant initiated the sexual tone of the conversations, leading to the sharing of sexually charged stories that he called "tales of the bizarre."[5] In these stories the appellant explicitly described male-on-male rape, sadomasochism, prostitution, and obsessive masturbation.

Despite the sexual nature of many of the conversations, the appellant did not solicit or request sex or an exchange of sexual photos from S.M.[6] After the agent posing as S.M. told the appellant that she thought about kissing him and wondered if the appellant thought about kissing her, the appellant responded that he did think about kissing and embracing her. As the NCIS operation progressed, the agent initiated sex-related discussions at an increasing rate. The agent introduced topics and questions regarding skinny dip-

---

[4] Prior to NCIS assuming the role of S.M., the appellant was not suspected of any crime. Record at 425.

[5] Prosecution Exhibit (PE) 2 at 25.

[6] The only photo that the appellant requested from S.M. was a picture of her father so that the appellant could avoid him if necessary. *Id.* at 208.

ping, being naked in front of a man, seeing a naked man for the first time, her virginity and lack of sexual experience, her fake friend's sexual experiences, and sleeping with the appellant. The appellant responded to S.M.'s concerns with detailed and lengthy answers that indicate that he was genuinely trying to be helpful to her. He also increasingly discussed his romantic interests in her.

The appellant kept a journal that included his thoughts and desires regarding different women, including S.M. It is clear from this journal that he wrestled with his conflicting desires of remaining faithful to his wife and having sex with other women, to include S.M. He expressed his sexual desire for S.M., who he called "Drops," in multiple passages. On 16 November 2015 he wrote, "Right now I lust after her greatly, too, but run high risk for seeing her."[7] On 27 November he wrote, "I lust after Drops, but I can't take advantage of her innocence."[8] The next entry, from 29 November 2015, includes a poem he wrote about S.M. that begins with the line "Shall We Go A Path Forbidden?"

> Shall we go, a path forbidden?
>
> A place where passion brings me?
>
> . . . .
>
> Shall we go, a warm embrace.
>
> A lust-filled encounter?
>
> . . . .
>
> Shall we go, together abed
>
> closeness, as one, thru the night?[9]

The appellant clearly understood the wrongfulness of his sexual interest in S.M., documenting it in his journal and communicating it to S.M. In one email to S.M. he wrote:

> What will you think of us should we progress too much further down the trajectory our paths seem to point? I know the world writ large would condemn me as a monster, a pervert,

---

[7] PE 11 at 9.

[8] *Id.* at 11, 15.

[9] *Id.* at 11-13, 15. Although the poem does not mention S.M. by name, the appellant admitted it was about her in his stipulation of fact. PE 35 at 10.

someone who preyed on the innocence of youth for my own gain. I would lose my job, most of my life savings, be labeled as a sex offender for the rest of my life (regardless of what really happened), lose my family—all because I want to hold you close, feel your skin, gently caress your cheek, smell the fragrance of your hair.[10]

In November 2015, the appellant proposed that he and S.M. meet and "go to the gym or my villa" after each of them completed a 30 day "yoga challenge." He and the agent posing as S.M. ultimately agreed to meet at the football field on the U.S. Naval Support Site near Naples. The appellant showed up at the Support Site, but the agent sent him a text indicating that she was not able to make their rendezvous. The agent apologized for not showing up and told the appellant that she left some gifts for him in the bleachers. NCIS agents had staged a bag with two movies, a large lollipop consisting of 15 smaller lollipops, and a jump rope. The appellant retrieved the gifts and they agreed to try to meet up again soon. In his journal entry the next day the appellant expressed sadness over not being able to meet with S.M.: "I think of how close I came to actually having a 15-yr old girl in my arms last night. I was literally seconds away—when the plan, albeit weak, fell apart."[11]

The appellant believed that S.M. shared his feelings: "Drops has declared her love for me in texts and strongly hinted at it in email."[12] His feelings for S.M. were so strong that they overcame his relationship with his wife: "I cannot believe that I am conniving to betray my wife with a teenager. I love my wife but stronger desire Drops. . . . I lust after Drops, but I can't take advantage of her innocence."[13]

In one of their email exchanges, the agent posing as S.M. told the appellant that her friend told her sex "just happens."[14] The appellant responded: "It just doesn't happen. We would have to let it. I will never, ever push you into something like that. We would only be that intimate if both of us are agreeing and ready. I have never let it just happen. For all the women I have

---

[10] PE 2 at 203.

[11] PE 11 at 9.

[12] *Id*. at 10.

[13] *Id*. at 11.

[14] PE 2 at 211.

been with, I have too much respect for them and you not to discuss it openly, honestly before proceeding."[15]

The agent posing as S.M told the appellant that she would be house- and dog-sitting the next weekend. The agent suggested that they have a sleepover for two days. After S.M. told the appellant that they might be able to spend two nights together the appellant expressed his excitement about the prospect. "I am twitching to meet up."[16] "I am thinking about you nearly continuously and am eager to hold you close."[17] "It still [sic] sinking in me that this chance for us has appeared."[18] "Now I only desire you."[19] "[T]he thought of being with you two nights in a row is very, very exciting!!"[20] He even sent S.M. a poem he composed in anticipation of their time together which included the lines: "The week nears with much anticipation, / Our fight with time, of attrition, / Together we seek our exploration, / As the wee!k [sic] marches nearer—excitation."[21]

Referring to their upcoming rendezvous, the agent asked the appellant, "What should we do next week?"[22] The appellant responded in part by stating, "Even if we just get to eat dinner and talk face to face for a while would be wonderful. What do you have in mind?"[23] In an email exchange a few days later, the appellant suggested that they "could cuddle up on the couch and watch movies."[24] The appellant told S.M.: "It would be amazingly awesome as we could have three nights together! :)";[25] "My crime of passion cometh";[26] and, "Counting the hours until our embrace."[27]

---

[15] *Id*. at 214.

[16] *Id*. at 207.

[17] *Id*. at 215.

[18] *Id*. at 219.

[19] *Id*. at 223.

[20] *Id*.

[21] *Id*. at 225.

[22] *Id*. at 224.

[23] *Id*.

[24] *Id*. at 225.

[25] PE 35 at 10.

[26] *Id*.

[27] PE 2 at 233.

The day before they were supposed to meet at the house where S.M. would supposedly be dog-sitting, the appellant reiterated his sexual desire for S.M.: "As for the decision, I think you know what I mean. We will talk about it together tomorrow, but I haven't stopped thinking about you and our decision all week."[28]

The appellant prepared for the sleep-over and showed up at the arranged on-base house with a bouquet of flowers, wine, food for dinner, the movies left on the bleachers, a souvenir piggy bank, his journal, and an overnight bag containing a change of clothes, toiletries, four condoms, and four packages of sexual lubricant. The appellant was apprehended by NCIS after he entered the house.

At trial, the appellant entered into a stipulation of fact with the government, pursuant to a pretrial agreement (PTA), for the offenses to which he pleaded guilty. The appellant and the government stipulated that the appellant "was prepared if S.M. wanted to have sex."[29]

Additional facts necessary to the resolution of the assignments of error are included in the discussion.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

The appellant challenges the legal and factual sufficiency of his convictions of specification 5 and 7 of Charge I. He asserts that the government failed to prove his specific intent to have intercourse with S.M., and to kiss and touch S.M.'s face, torso, hips, and legs. He claims that his intent when he drove to the house where he believed S.M. to be waiting for him was conditional on S.M.'s consent to physical contact and sexual intercourse.[30]

We review questions of legal and factual sufficiency *de novo*. Art 66(c), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have

---

[28] *Id*. at 242.

[29] PE 35 at 11.

[30] The appellant argues that the facts developed at trial constitute a violation of attempted enticement of a minor to engage in sexual activity under 18 U.S.C. § 2422(b), but are inadequate to constitute a violation of the charged offense, attempted sexual abuse of a child in violation of Article 80, UCMJ.

found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297-98, (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)).

The test for factual sufficiency is whether "after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [this court is] convinced of appellant's guilt beyond a reasonable doubt." *Rosario*, 76 M.J. at 117 (citation, internal quotation marks, and emphasis omitted). In conducting this unique appellate function, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399. Proof beyond a reasonable doubt does not mean, however, that the evidence must be free from conflict. *United States v. Goode*, 54 M.J. 836, 841 (N-M. Ct. Crim. App. 2001).

The elements of attempted sexual assault of a child as alleged in Specification 5 of Charge I are: (1) that the appellant did a certain overt act; (2) that the act was done with the specific intent to commit a sexual act upon a child, "to wit: penetrating her vagina with his penis";[31] (3) that the act amounted to more than mere preparation; and (4) that the act apparently tended to effect the commission of the intended offense.[32]

The elements of attempted sexual abuse of a child as alleged in Specification 7 of Charge I are the same as Specification 5 except the second element is: (2) that the act was done with the specific intent to commit a lewd act upon a child, "to wit: kissing and touching her face, torso, hips, and legs."[33]

In finding the appellant guilty of these specifications, the military judge considered both acts as part of the same sexual encounter. He stated in his special findings, "[it] was clear to the court, by proof beyond a reasonable doubt, that the accused intended to kiss S.M., touch her face, torso, hips and legs as foreplay prior to engaging in sexual intercourse."[34] After findings were announced, he merged the two specifications for sentencing.

---

[31] Charge Sheet, Charge I, Specification 5.

[32] MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.) (MCM), Part IV, ¶ 4.b.

[33] Charge Sheet, Charge I, Specification 7.

[34] Appellate Exhibit (AE) XXXII at 10.

For inchoate offenses, the government must prove beyond a reasonable doubt that the appellant had the requisite *mens rea* concurrent with an *actus reus*.[35] The *mens rea* for inchoate offenses is specific intent to commit the underlying offense. Therefore, the government must prove beyond a reasonable doubt that the appellant had the specific intent to penetrate S.M.'s vagina[36] with his penis, and to kiss and touch S.M.'s face, torso, hips, and legs. The *actus reus* for inchoate offenses is an overt act that "goes beyond preparatory steps and is a direct movement toward the commission of the [underlying] offense."[37] Therefore, the government must also prove beyond a reasonable doubt that the appellant committed an overt act that constituted a substantial step towards penetrating S.M.'s vagina with his penis and kissing and touching S.M.'s face, torso, hips, and legs.

The appellant claims that notwithstanding his *desire* to kiss, touch, and have sex with S.M., he did not have the *specific intent* to do so when he was apprehended because he and S.M. had not finalized "their decision." The appellant says his desire and preparatory actions are insufficient to constitute specific intent and *actus reus*.

The key issues for this court then are whether the appellant possessed the specific intent to penetrate S.M.'s vagina with his penis and whether he possessed the specific intent to kiss and touch S.M.'s face, torso, hips, and legs. If he did, then traveling to a rendezvous location where he believed S.M. to be waiting for him is enough to constitute a substantial step towards commission of the offenses, *i.e.*, the *actus reus*. This court has held that traveling to meet a child with whom the accused has the specific intent to commit a crime of sexual assault is sufficient to constitute a substantial step toward completion of the crime. *United States v. Beltran*, No. 201500270, 2017 CCA LEXIS 96 at *13, (N-M. Ct. Crim. App. 14 Feb 2017) (unpub. op.) (concluding appellant's travel to meet an undercover agent he believed to be a 14-year-old girl amounted to a "substantial step towards having sex with her"), *rev. denied*, 76 M.J. 400 (C.A.A.F. 2017); *United States v. Grina*, No. 201700008, 2018 CCA LEXIS 61 at *9, (N-M. Ct. Crim. App. 8 Feb 2018) (unpub. op.) (traveling to meet a minor for sexual activity amounted to the necessary "substan-

---

[35] See MCM, Part IV, ¶ 4.c.(1).

[36] A sexual act under Art. 120b only requires the government to prove penetration, however slight, of the *vulva* by a penis. *See* Part IV, ¶ 45b.a.(h)(1), MCM. Here, however, the government chose to charge a more specific penetration, specifying penetration of the *vagina* vice the vulva.

[37] Part IV, ¶ 4.c.(2), MCM.

9

tial step toward completing his intended crime"), *rev. denied*, 78 M.J. 17 (C.A.A.F. 2018); *United States v. Keeter*, No. 201700119, 2018 CCA LEXIS 474 at *7, (N-M Ct. Crim. App. 3 Oct 2018) (unpub. op.) (visiting the home of the minor knowing her mother would be away was a substantial step required by the elements of the offense).

If the appellant did *not* possess specific intent, then traveling to the rendezvous location was insufficient to constitute an attempt. Indeed, if the appellant did not possess the requisite specific intent, then *actus reus* is irrelevant to our analysis and the appellant is not guilty of the two specifications.

The evidence shows that at the time the appellant arrived at the house to start his three-day tryst with S.M., they had not agreed on what specific sex acts they were going to perform, if any. In the admitted stipulation of fact, the appellant and the government stipulated that the appellant "was prepared if S.M. wanted to have sex."[38] The appellant and the government, including the NCIS agent playing the role of S.M., agreed that sex between the appellant and S.M. was conditional on a discussion that would occur after the appellant arrived at the residence. The appellant understood, therefore, that he might not have sex with S.M.—if she did not agree to it. Still, the appellant's intention was obvious. He had described what he wanted to do to S.M. in his emails to her and to himself in his journal. He believed that S.M. loved him. When he told S.M. that his "crime of passion cometh," he was clearly referring to sex with her. Bringing condoms and sexual lubricant to their multiday overnighter was more than a mere precaution for "just in case" sex occurred. It was direct evidence of his intent.

Although the appellant may not have explicitly discussed his intention of having sex with S.M., he clearly and repeatedly communicated his romantic intentions to her:

> I wish I could say that I have only thought of kissing you. But it wouldn't be accurate. My thoughts have more akin to our embrace, imagining what you smell like, the fragrance of your hair, feeling the supple curves of your body melding next to mine, feeling the warmth in your breathing, and the soft moistness of your lips . . . just to describe a little of what I imagine. :)[39]
>
> . . . .

---

[38] PE 35 at 11.

[39] PE 2 at 211.

The morning dew covered my car, you, so close, yet so far, I wonder aloud how this can be true, as I sit in my car of blue. As mid-week approach so fast, our path ahead seems so clear, How I wait, impatient, heart race quick, to hold you near.

As you wake, and roll upright, think of me holding you tight.  As you ride this morn with bliss, imagine our gentle warm kiss. And while passion burns deep inside, may we find nothing to hide, Our time, our fate, our future, our present, to decide.[40]

. . . .

I haven't stopped thinking about you and our decision . . . .[41]

The appellant believed that S.M. reciprocated his feelings. Shortly before their planned rendezvous, the agent posing as S.M. emailed the appellant: "I can only think about how it would feel to kiss you and touch you. I don't really know how it would feel because I've never really kissed anyone that I loved like I do you but I think about it a lot."[42] S.M. had even asked him to bring something for her to wear to bed and had expressed her desire to sleep in and cuddle with him.[43]

The appellant's extensive emails to S.M., his detailed journal entries, and his condom and sexual lubricant supply belie any innocent intent. In addition, his sexually graphic emails to S.M.–his "tales of the bizarre"–constitute classic grooming behavior reflecting his efforts to sexualize the relationship and arouse her sexual curiosity. *See, e.g., United States v. Garner*, 67 M.J. 734, 739 (N-M. Ct. Crim. App. 2009), *aff'd*, 69 M.J. 31 (C.A.A.F. 2010) (examples of "classic 'grooming' behavior in preparation for a future sexual encounter"). Those emails formed the basis for other specifications of attempted sexual abuse of a child. The appellant pleaded guilty to two of the specifications and was found guilty of a third specification, all involving lewd acts resulting from indecent language in his emails to S.M.

The appellant's multiple references to the wrongfulness of his actions, such as telling S.M. that his "crime of passion cometh," reflect a conscious-

---

[40] *Id.* at 243.

[41] *Id.* at 242.

[42] *Id.* at 205.

[43] *Id.* at 238.

ness of guilt and are additional evidence of specific intent. *See United States v. Farley*, 607 F.3d 1294, 1333-34 (11th Cir. 2010) (communication with undercover agent evidenced defendant's criminal intent to entice underage child into sexual activity).

A reasonable finder of fact could easily conclude that the appellant intended to kiss and touch S.M.'s body as he described in his emails to her and in his journal. Such a fact-finder could also determine that the appellant brought condoms and lubricant to his meeting with S.M. to help him insert his penis into S.M.'s vagina. We are also convinced beyond a reasonable doubt that that is exactly what the appellant intended to do with them. We are also convinced beyond a reasonable doubt that the appellant intended to kiss and touch S.M.'s face and body.

The fact that the appellant was not going to rape S.M. by force–that he intended to have a conversation about it before they had sex–does not negate his intent to sexually assault and sexually abuse S.M. Intent need only exist in the mind of the appellant and can be proved circumstantially. No meeting of the minds with his victim or extrinsic evidence of his intent was required for these attempted offenses. Nor does it matter that the appellant might have peacefully acquiesced if his attempts had not worked out in the way he desired.

The Supreme Court has held that the specific intent required by a criminal statute can be conditional. *Holloway v. United States*, 526 U.S. 1 (1999). In that case, the Court determined that a carjacker who points a gun at a driver, having decided to shoot the driver *only if* the driver does not comply with the carjacker's demands, possesses the specific intent to seriously harm the driver in violation of the federal carjacking statute. *Id*. at 7.[44]

*Holloway* cites to *People v. Connors,* 97 N.E. 643 (Ill. 1912), as the leading case on conditional intent. In *Connors*, the Illinois Supreme Court affirmed the conviction of a union organizer who had pointed a gun at a worker and threatened to kill him if he did not stop working. The court held that the "specific intent to kill" could be found even though that intent was "coupled

---

[44] *See also,* Section 2.02(6) of the Model Penal Code:

> When a particular purpose is an element of an offense, the element is established although such purpose is conditional, unless the condition negatives the harm or evil sought to be prevented by the law defining the offense.

Model Penal Code § 2.02(6) (Am. Law Inst. 1985). In this case, the appellant's condition, obtaining actual consent from S.M. before having sex with her, would not have negated the harm sought to be prevented by Art. 120b, UCMJ.

with a condition" that the defendant would not fire if the victim complied with his demand. *Connors,* 97 N.E. at 645. Important to the Illinois Supreme Court's decision was their determination that the condition placed upon the victim was one that the defendant had no right to make. *Id.* at 646.

Borrowing from the reasoning of *Holloway* and *Connors*, we hold that the condition on the appellant's intended actions with S.M.—namely that he would seek her actual consent before kissing her and having sexual intercourse with her—does not negate the appellant's specific intent to do those things. If an accused decided to rob a bank and drove up to the bank with a gun in furtherance of his plan, but then abandoned his plan when he saw an armed guard inside the bank, he would still be guilty of attempted bank robbery.

Additionally, the appellant's condition was one he had no right to place. The appellant's planned "conversation" was not going to be between equally positioned individuals. S.M. was 15 years old and legally incapable of consenting to sex. The appellant was in his late 40's, a father of several children, and had 27 years' experience as a commissioned naval officer. Based on his prior course of conduct with S.M. and his extensive preparations for their multi-night encounter, we conclude that the appellant was actively grooming S.M. in an effort to lead her down the "forbidden path" to his "crime of passion." Perhaps the appellant's specific intent could be called conditional, but he had taken every opportunity to ensure that S.M. would have sex with him when he showed up at her door. Further, the record establishes that he believed that she reciprocated his romantic desires. His intent to engage in sex with S.M. was clear.

Under the facts of this case, viewed in a light most favorable to the prosecution, we find that a reasonable finder of fact could easily conclude that the appellant possessed the requisite *mens rea* for both specifications and that his travel to the rendezvous location was a sufficient *actus reus* to constitute a substantial step towards completion of the offenses. The fact that he traveled to the rendezvous location with supplies for his sexual encounter in hand is further evidence supporting the reasonableness of this conclusion. Additionally, after weighing all the evidence presented at trial and making allowances for not having personally observed the witnesses, we too are convinced beyond a reasonable doubt of the appellant's guilt.

**B. Error in the Court-Martial Order**

The appellant asserts that the CMO is erroneous because each specification listed under Charge I contains prefatory parenthetical information misidentifying the specification as a completed offense vice an attempted offense. With the exceptions noted below, the specifications listed on the CMO are

identical to the specifications as they appear on the charge sheet. We also note that the Report of Results of Trial erroneously summarizes all of the specifications under Charge I as completed offenses vice attempted offenses.

Defects in the charges and specifications should have been raised at trial before pleas were entered. Rule for Courts-Martial 905(b)(2), MCM. Therefore, the issue was waived. R.C.M. 905(e); *United States v. Hardy*, 77 M.J. 438, 442 (C.A.A.F. 2018).

However, just because misleading parenthetical descriptions of the offenses on the charge sheet were waived at trial does not mean the error should be perpetuated in the post-trial process. Here, we are reviewing errors in the CMO and not the charge sheet.

Although not raised by the appellant, this court also notes additional errors in the CMO. There are scrivener's errors in Specifications 1 and 3 under Charge I. Specification 1 uses the word "set" instead of the correct word "sex." Specification 3 omits the specific language: "to wit: intentionally communicate indecent language to S.M. via email" contained in the correct specification on the charge sheet and to which the appellant pleaded guilty.

We agree that the CMO contains errors and misleading information that the convening authority should have corrected or omitted. We review error in CMOs under a harmless error standard. *United States v. Crumpley,* 49 M.J. 538, 539 (N-M. Ct. Crim. App. 1998). The appellant has not asserted, and we do not find, that these errors materially prejudiced his substantial rights. However, the appellant is entitled to accurate court-martial records, and we order corrective action in the decretal paragraph.

## III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, we have determined that the approved findings and sentence are correct in law and fact and that no error materially prejudicial to the appellant's substantial rights occurred. Arts. 59 and 66, UCMJ. Accordingly, the findings and sentence as approved by the convening authority are **AFFIRMED**.

The supplemental promulgating order shall correct the text of Specifications 1 and 3 of Charge I, and will add the word "attempted" to the parenthetical headers of all specifications under Charge I.

Senior Judge FULTON concurs.

HITESMAN, *Judge* (dissenting):

I respectfully dissent because this court has never found and we should not now hold that specific intent can be conditional. Additionally, the particular facts of this case prevent finding a sufficient overt act and substantial step occurred concurrently with the requisite specific intent, even if conditional.

## I. DISCUSSION

To be guilty of attempted sexual assault of a minor and attempted sexual abuse of a child, the government must prove that the appellant had the specific intent to "penetrat[e] her vagina with his penis"[1] and to "kiss[ ] and touch[ ] her face, torso, hips, and legs"[2] concurrent with a substantial step towards the commission of the intended offense.[3] The military judge considered both specifications as part of the same sexual encounter, merged them for sentencing, and found that travelling to the residence amounted to the requisite substantial step for both specifications.[4]

### A. Conditional Specific Intent

There is no doubt that the appellant had an intense desire to have sex with the persona he believed to be S.M., a fifteen-year-old girl. However, that desire did not constitute the required criminal specific intent to commit sexual assault and sexual abuse of a minor because it was conditional. The appellant and S.M. had not yet had a discussion, as agreed and understood by both, to determine whether to proceed or not with sex.

*Holloway v. United States,*[5] does not support the premise that specific intent can be conditional for every offense under the UCMJ[6] that requires spe-

---

[1] Charge Sheet, Charge I, Specification 5.

[2] Charge Sheet, Charge I, Specification 7.

[3] Part IV, ¶ 4.b, MCM.

[4] Record (R) at 628, Appellate Exhibit (AE) XXXII at 10. The military judge stated in his special findings that "[it] was clear to the court, by proof beyond a reasonable doubt, that the accused intended to kiss S.M., touch her face, torso, hips and legs *as foreplay* prior to engaging in sexual intercourse." AE XXXII at 10. (emphasis added). Having reviewed the entire record of trial, there is no evidence of the appellant's desire to kiss and touch S.M.'s "torso, hips, and legs" or to do so as foreplay.

[5] 526 U.S. 1 (1994).

cific intent as *mens rea*. In *Holloway*, the Supreme Court analyzed the federal carjacking statute[7] for whether the stated "intent to kill or cause serious bodily harm" was conditional, unconditional, or both.[8] The Court held that Congress intended to criminalize both the conditional and unconditional specific intent for *that* statute.[9]

*Holloway* is distinguishable because the Court was not analyzing specific intent *writ large* or even as applied to inchoate offenses. Rather, the Court was looking at the purpose of a particular statute finding that "Congress intended to criminalize a broader scope of conduct than attempts to assault or kill in the course of automobile robberies."[10] The Court looked at the legislative history and wording of the statute to conclude that Congress intended to criminalize both conditional and unconditional intent as required by that specific statute.[11] There is no evidence that Congress intended to similarly criminalize conditional specific intent for *all* offenses under the UCMJ.

Additionally, in *Holloway,* the crime Congress sought to criminalize was violent carjacking. A crime involving duress, threats of violence, and actual acts of violence. The Court found that Congress must have intended to criminalize conditional intent because the purpose of the statute "is better served by construing it to cover both the conditional and the unconditional . . . intent."[12] Here, despite the age difference, the appellant was seeking a freely-made decision by the S.M. on whether to proceed with sex or not. There is no evidence that he intended to coerce, threaten violence, or place S.M. under duress in order to get the outcome he desired. Likewise, there is no evidence that the appellant would have forced S.M. to have sex if she did not decide to proceed willingly. Indeed, the record supports the opposite.[13] Finally, there is

---

[6] 10 U.S.C. §§ 801-946.

[7] 18 U.S.C. § 2119.

[8] *Holloway*, 526 U.S. at 7.

[9] *Id.*

[10] *Id.*

[11] *See generally id.*

[12] *See id.* at 9.

[13] Referring to their planned rendezvous, fake S.M. asked the appellant "What should we do next week?" PE 2 at 224. Appellant responded in part by stating: "Even if we just get to eat dinner and talk face to face for a while would be wonderful. What do you have in mind?" *Id.* In an email exchange a few days later, the appellant only went as far as to suggest that they "could cuddle up on the couch and watch movies." *Id.* at 225.

no rationale that the statute concerned here is better served by reading into it a conditional intent option. In fact, a better option already exists within the UCMJ—charging the conduct as an attempt to entice a child to engage in sexual conduct under Article 134, UCMJ, as a violation of 18 U.S.C. § 2422(b), as was done in *United States v. Farley*,[14] a case cited by the majority.[15] As Justice Scalia stated, dissenting in *Holloway,* "[i]t is difficult enough to determine a defendant's actual intent,"[16] reading conditional intent into the statute would be "sending [courts-martial and members] off to wander through 'would-a, could-a, should-a land.'"[17]

## B. Substantial Step

"[T]he overt act must amount to a 'substantial step' toward commission of the intended crime, and it must be an act that is strongly corroborative of the firmness of the accused's criminal intent."[18] It must be an act that "apparently would have resulted in the actual commission of the [underlying offense] except for (a circumstance unknown to the accused) [or] (an *unexpected* intervening circumstance) . . . which prevented completion of that offense."[19] The substantial step must "unequivocally demonstrate that the crime will take place unless interrupted by independent circumstances."[20] A substantial step is one that is "indicative of [the accused's] resolve to commit the offense."[21]

---

[14] 607 F.3d 1294 (11th Cir. 2010).

[15] For courts-martial, this offense is charged as a violation of Article 134, UCMJ, 10 U.S.C. § 934.

[16] *Holloway*, 526 U.S. at 19 (Scalia, J., dissenting).

[17] *Id.*, at 31.

[18] *United States v. Williamson*, 42 M.J. 613, 616 (N-M. Ct. Crim. App. 1995) (quoting *United States v. Byrd*, 24 M.J. 286 (C.M.A. 1987)) (additional citations omitted).

[19] Military Judges' Benchbook, Dept. of the Army Pamphlet 27-9, ¶ 3-4-1(c)(4) (1 Sep. 2014) (emphasis added). *See also United States v. Alameda*, 57 M.J. 190, 200 (C.A.A.F. 2002) (unexpected intervening circumstance); *United States v. Roeseler*, 55 M.J. 286, 290 (C.A.A.F. 2001) (circumstance unknown to accused).

[20] *United States v. Winckelmann*, 70 M.J. 403, 407 (C.A.A.F. 2011) (citations, internal quotation marks, and alteration omitted).

[21] Benchbook, ¶ 3-4-1(d). *See also United States v. Garner*, 69 M.J. 31, 32 (C.A.A.F. 2010).

Citing *United States v. Beltran*,[22] the majority holds that merely traveling to the fake residence with condoms and lubricant amounts to a substantial step towards commission of the alleged offense. However, this Court in *Beltran* only looked at cases involving the attempted enticement of a minor to engage in sexual activity under 18 U.S.C. § 2422(b).[23] Enticement cases do provide some general support for the proposition that traveling to the location of the minor can constitute the required substantial step in a prosecution for certain attempted sexual offenses.[24] But, even in enticement cases, "travel is not a *sine qua non* of finding a substantial step."[25] Whether or not the travel is dispositive of a substantial step will ultimately depend on the facts of the case.[26]

Attempted sexual assault of a child is unlike attempted enticement of a child where the intended offense is more likely to be completed when the accused arrives at the location of the fake minor where the offender would have tried to convince the minor to engage in sexual conduct. In attempted sexual assault of a child cases, it is *possible* that mere travel to the location will constitute the required substantial step, but more than that *may be required* based on the facts of each case. The appellant in this case was not charged with attempted enticement. If he had been, I would agree that traveling to the rendezvous location would have been sufficient to constitute a substantial

---

[22] 2017 CCA LEXIS 96 (N-M. Ct. Crim. App. Feb. 14, 2017).

[23] For the military parallel, *see supra*, note 15.

[24] *See United States v. Winckelmann*, 70 M.J. 403, 407 (C.A.A.F. 2011) ("[C]ourts agree that travel constitutes a substantial step" in prosecutions for child enticement under 18 U.S.C. § 2422(b)); *United States v. Beltran*, No. 201500270, 2017 CCA LEXIS 96 at *13, (N-M. Ct. Crim. App. 14 Feb 2017) (unpub. op.) (concluding appellant's travel to meet an undercover agent he believed to be a 14-year-old girl amounted to a "substantial step towards having sex with her"), *rev. denied*, 76 M.J. 400 (C.A.A.F. 2017); *United States v. Grina*, No. 201700008, 2018 CCA LEXIS 61 at *9, (N-M. Ct. Crim. App. 8 February 2018) (unpub. op.) (traveling to meet a minor for sexual activity amounted to the necessary "substantial step toward completing his intended crime"), *rev. denied*, 78 M.J. 17 (C.A.A.F. 2018); *United States v. Keeter*, No. 201700119, 2018 CCA LEXIS 474 at *7, (N-M Ct. Crim. App. 3 October 2018) (unpub. op.) (visiting the home of the minor knowing her mother would be away, was a substantial step required by the elements of the offense).

[25] *Winckelmann*, 70 M.J. at 407 (citations and alterations omitted).

[26] *Id.* ("[D]ifferent types of evidence can establish a substantial step depending on the facts of a particular case.")

step because the evidence clearly shows that he and fake S.M. agreed to discuss whether or not to have sex.

Other recent opinions of this court finding travel to be a substantial step towards completing the offense of sexual assault of a child and sexual abuse of child are also distinguishable from the facts in this case. In *United States v. Beltran*,[27] *United States v. Grina*,[28] and *United States v. Keeter*,[29] the required substantial step was found in each case when the appellant traveled to the location of the fake minor. In *Beltran* and *Grina*, the sexual communications between the accused and the fake minor included explicit statements identifying the desired sex acts that the appellant wanted to engage in with the fake minor. The appellant in *Beltran* had already negotiated a price for sexual acts with the fake minor before he traveled to the public park to meet her.[30] The appellant in *Grina* clearly expressed his desires to perform oral sex on the fake minor telling her to "plan to have oral but prepare in case more happens."[31] While the appellant in *Keeter* never explicitly told the fake minor that he wanted to have sexual intercourse with her, he did send naked pictures of himself to her and encouraged her to masturbate.[32] He also expressed his desire to have a "friends with benefits" relationship where one such benefit was sex.[33] Significantly, the appellant in each of these cases, claimed that he did not have the necessary specific intent to have sex with the fake minor when he traveled to the rendezvous location.[34] Yet none of

---

[27] *United States v. Beltran*, No. 201500270, 2017 CCA LEXIS 96, (N-M. Ct. Crim. App. 14 Feb 2017) (unpub. op.), *rev. denied*, 76 M.J. 400 (C.A.A.F. 2017).

[28] *United States v. Grina*, No. 201700008, 2018 CCA LEXIS 61, (N-M. Ct. Crim. App. 8 Feb 2018) (unpub. op.), *rev. denied*, 78 M.J. 17 (C.A.A.F. 2018).

[29] *United States v. Keeter*, No. 201700119, 2018 CCA LEXIS 474, (N-M Ct. Crim. App. 3 Oct 2018) (unpub. op.).

[30] *Beltran*, 2017 CCA LEXIS 96, at *11.

[31] *Grina*, 2018 CCA LEXIS 61, at *8.

[32] *Keeter*, 2018 CCA LEXIS 474, at *3.

[33] *Id.* at *7.

[34] Chief Aviation Electrician's Mate Beltran argued that he did not intend "to engage in sexual acts with a minor" but that he traveled to the public park to "first verify that the woman he had spoken with online was of age." *Beltran*, 2017 CCA LEXIS 96, at *11. Lance Corporal Grina claimed "he intended only innocent activity when he traveled to meet Christina." *Grina*, 2018 CCA LEXIS 61, at *8. Lieutenant Commander Keeter claimed he traveled to the rendezvous residence to "meet Cris and see who she was and go grab a bite to eat." *Keeter*, 2018 CCA LEXIS 474, at *6.

these appellants made explicit statements to, or made agreements with, the law enforcement agent playing the role of the minor regarding their plan to discuss and decide at a later time about whether or not to have sex.

Although the appellant here engaged in sexually charged communications with fake S.M. who he believed to be 14 or 15 years old, those communications did not involve any specific acts that the appellant professed that he was going to engage in with S.M. Instead, the sexually graphic discussions were descriptions of other events and circumstances involving other people—not S.M. Further, he did not send S.M. pictures of himself nude, nor did he direct her to engage in any sexually explicit conduct such as masturbation. On the contrary, the appellant and the NCIS agent playing the role of S.M. both clearly understood that no sex would occur until they had a conversation and made a decision on whether or not to proceed. This understanding was not merely present in the mind of the appellant or a fanciful and unsupported argument raised by the appellant at trial or on appeal as it was in *Beltran*, *Grina*, and *Keeter*. The facts of this case establish that the appellant was *not resolved* to have sex with S.M. until after they had had a discussion about engaging in sex. Indeed, at all times, he intended to have sex with her *only* if they mutually decided to do so.

Moreover, the record is clear that a discussion on whether or not to have sex would have to take place before the appellant and S.M. engaged in any sex acts. This prerequisite discussion was not just a condition in the mind of the appellant. When fake S.M. asked appellant about sex, relaying that her friend told her sex "just happens,"[35] the appellant responded, "[f]or all the women I have been with, I have too much respect for them and you not to discuss it openly, honestly before proceeding . . . it will never 'just' happen between us."[36] And on the day before they were to meet at the house where fake SM was fake dog sitting, the appellant reiterated, "[a]s for the 'decision,' I think you know what I mean. We will talk about it together tomorrow."[37] At trial, the NCIS agent who played the role of S.M. testified on cross-examination that "[i]t is clear that he is going to have a conversation"[38] and agreed that sex "was an open question"[39] and "[a] decision yet to be made"[40]

---

[35] PE 2 at 211.

[36] *Id.* at 214.

[37] *Id.* at 242.

[38] R. at 489.

[39] *Id.* at 488.

at the time the appellant was apprehended. Finally, in the stipulation of fact, the appellant and the government stipulated that the appellant "was prepared *if* S.M. wanted to have sex."[41] S.M.'s decision whether to have sex was not an *unexpected* intervening circumstance. Rather, it was a circumstance the accused contemplated all along. Therefore, merely traveling to the residence in this case fails to amount to a substantial step towards the commission of the offenses of attempted sexual assault of a child and attempted sexual abuse of a child. Showing up at the agreed upon location, even with condoms and lubricant, was mere preparation at that point because any potential sex was still conditional upon the outcome of their discussion on whether or not to proceed. In this case, the act of traveling to the residence cannot "unequivocally demonstrate that the crime *will* take place unless interrupted by *independent* circumstances."[42] That the charged crimes would have been committed, *if at all*, were conditioned *and dependent* upon the requisite agreement beforehand.

## II. CONCLUSION

The evidence is factually and legally insufficient to sustain findings of guilty as to Specifications 5 and 7 of Charge I and I would set aside those specifications.



FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court

---

[40] *Id.* at 490.

[41] PE 35 at 11 (emphasis added).

[42] *United States v. Winckelmann*, 70 M.J. 403, 407 (C.A.A.F. 2011) (citations, internal quotation marks, and alteration omitted) (emphasis added).